IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

MAR 7 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

IRENE MILLS,

      Plaintiff,

v.

                                Civil Action No.  5:13CV57
                                (The Honorable Frederick P. Stamp, Jr.)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social

Security Administration ("Defendant," and sometimes "Commissioner") denying Irene Mills'

("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act.  The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact

and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed her application for SSI on August 30, 2011, alleging a disability onset date of

November 1, 2006 (R. 158-63).  The application was denied initially and on reconsideration (R. 100-

15). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Marie Alexander Nunez

held on November 7, 2012.  Plaintiff, represented by counsel, Alan Nuta, and Vocational Expert

("VE") Jan Howard Reed testified (R. 36-68).  By decision dated November 28, 2012, the ALJ found

Plaintiff could perform less than a full range of sedentary work (R. 21-30). Plaintiff timely filed an

appeal of the decision to the Appeals Council.  The Appeals Council denied Plaintiff's request for

review on February 25, 2013, making the ALJ's decision the final decision of the Commissioner (R. 1-6).

## II. FACTS

Plaintiff was born on April 23, 1967, and was forty-four (44) years old on the date of the administrative hearing (R. 158). Plaintiff completed the eleventh grade of high school and obtained her GED (R. 43, 182). She had no special education classes while in school. She also completed a certified nursing assistant class in 2004 (R. 182). Plaintiff's past work was that of caretaker in a nursing home, cleaner in a motel, laborer in a factory, and clerk/cashier in a grocery store (R. 183).

Plaintiff presented to a medical professional at Tri-State Community Health Center on November 3, 2006, for a follow-up examination for her treatment at the emergency room for COPD. Plaintiff stated she could not "'stop smoking.'" She slept upright and had heartburn. Plaintiff was nervous "but better today." She was prescribed Prilosec and Spiriva (R. 293-94).

On December 4, 2006, a medical professional at Tri-State Community Health Center treated Plaintiff for COPD and back pain. Plaintiff stated her gastroesophageal reflux disease ("GERD") had improved with Nexium, but her back pain was worse. Her lungs, heart, and neurological examinations were normal (R. 290). She was diagnosed with anxiety, dyspnea, improved GERD, chronic spinal stenosis, and upper extremity radiculopathy and prescribed Lexapro, Spiriva, and Nexium (R. 291).

Plaintiff's December 15, 2006, cervical spine MRI showed "focal spondylosis at C5-6 with severe canal stenosis and bilateral C6 foraminal narrowing due to spondylotic ridge and uncinate hypertrophy. There [was] slight cord flattening without abnormal signal intensity in the cord, suggesting that these changes [were] chronic" (R. 334).

Plaintiff's December 28, 2006, chest x-ray showed "slight increased interstitial markings in both lungs" (R. 341, 365). Her pulmonary function test was within normal limits; the results showed normal pulmonary function (R. 368, 381).

Plaintiff presented to a medical professional at Tri-State Community Health Center on January 3, 2007, for follow-up treatment for anxiety and depression. She had been "out of Lexapro since Friday last week." Plaintiff stated she had difficulty "waiting for thing[s]" because she was a "type A personality." She slept too much. Lexapro caused dry mouth. Upon examination, Plaintiff was negative for suicidal or homicidal ideations, feelings of sadness, inability to experience pleasure, manic periods, and anxiety. She was alert and oriented. Her affect was appropriate; her sensorium was clear; her thought content was normal. Plaintiff scored a "0" on the Beck Depression Inventory ("BDI"). She was diagnosed with anxiety and her dosage of Lexapro was increased (R. 286-88).

Plaintiff reported to a medical professional at Tri-State Community Health Center on June 21, 2007, that she had no improvement to her anxiety symptoms. She was depressed. She was not sleeping well, and her exercise was limited due to back pain. Plaintiff reported her daughter and grandchildren had moved in with her. She was "fidgety" and "restless." Upon examination, Plaintiff was alert and oriented and offered appropriate responses to questions and commands. Her speech was productive and coherent, affect appropriate, thought content relevant, and sensorium clear. Her dosage of Paxil was increased and her prescription for Lexapro was discontinued (R. 279-80).

Dr. Rosen evaluated Plaintiff for anterior cervical discectomy and fusion on July 31, 2007 (R. 372). Plaintiff's lungs were clear to auscultation, bilaterally; her gait and station were slightly stiff; her strength was "4-4+/5 bilaterally"; she had intact sensation to light touch in all extremities; she had positive clonus; her tone was without spasticity; her rapid alternating movements were smooth and

accurate; she was alert and oriented; her concentration and attention span were normal. Dr. Rosen reviewed Plaintiff's MRI and diagnosed cervical spondylitic myelopathy at C5-C6. He recommended Plaintiff undergo an anterior cervical discectomy and fusion (R. 374-75). Dr. Rosen requested that the medical professional at Tri-State Community Health Center who cared for Plaintiff continue to provide pain medications and obtain medical clearance for the procedure (R. 372).

At Plaintiff's August 2, 2007, appointment with a nurse practitioner at Tri-State Community Health Center, it was noted that Plaintiff was positive for anxiety, stress, shortness of breath, cough, joint pain, and muscle pain. Plaintiff had decreased strength in her lower extremities; it was 4/5. Her deep tendon reflexes and sensation were within normal limits. It was noted Plaintiff's functional capacity was "moderate or excellent." Dr. Rosen ordered "cardiac + pulmonlogy (sic) evaluation" and a follow up evaluation for anxiety. It was recommended that Plaintiff cease smoking (R. 277-78).

Plaintiff was treated by a medical professional at Tri-State Community Health Center on August 13, 2007, for depression, anxiety, and stress. Plaintiff stated she had been under "lots stress lately." Her house was "really clean. If not clean or if family doesn't clean her way, she yell[ed]." Her examination was normal. Plaintiff's deep tendon reflexes, strength, and sensations were within normal limits (R. 272). Plaintiff was diagnosed with anxiety and her dosage of Paxil was increased (R. 273).

Dr. Hardy completed a consultative preoperative examination of Plaintiff on August 21, 2007. Dr. Hardy noted Plaintiff had injured her cervical spine in an automobile accident, which resulted in disc herniation that required "surgical decompression" and had complained of "chest heaviness" and shortness of breath, for which he was evaluating Plaintiff relative to the back surgery. Plaintiff reported she had had asthma for twenty (20) years; her symptoms were relieved by the use of an

inhaler. Plaintiff experienced a "heavy sensation." It could "sometimes" be relieved with the use of antacid medications, the use of inhalers, or on its own. The sensation was not caused by exertion and did not radiate. Plaintiff also experienced an intermittent pinching sensation in her chest. Plaintiff reported she had smoked one (1) package of cigarettes per day for the past seventeen (17) years (R. 346, 370). Dr. Hardy's examination produced no jugular venous distention or bruits, clear lungs, normal heart rate and rhythm, soft and non-tender abdomen, and normal extremities. Dr. Hardy assessed atypical chest pain, dyspnea, and tobacco abuse. He ordered a Cardiolite scan (R. 347, 371).

Plaintiff's October 3, 2007, chest x-ray was normal except for a "small pulmonary nodule within the right lung probably a benign finding . . ." (R. 612).

On October 12, 2007, Dr. Rosen and Dr. Courtney performed a C5-C6 anterior cervical discectomy and fusion of Plaintiff (R. 352, 606).

Plaintiff's October 30, 2007, cervical spine x-ray showed "stable post treatment appearance of surgical fixation at the C5-C6 level" (R. 610).

Dr. Rosen wrote to Dr. Hahn, on October 30, 2007, relative to his post anterior cervical discectomy and fusion of Plaintiff. Plaintiff reported continued burning pain in her right upper arm, right trapezius pain, and numbness in her jaw and at the incision site. Upon examination, Plaintiff's vital signs were stable; her gait and station were smooth and steady. Her strength was 5/5, bilaterally. Her tone was normal; her sensation was intact; and her deep tendon reflexes were 2+, bilaterally. Dr. Rosen noted Plaintiff's symptoms "should continue to improve with time" (R. 351).

Plaintiff's December 18, 2007, cervical x-rays showed stable C5-C6 anterior cervical discectomy with no "evidence of malalignment or hardware failure." The pervertebral soft tissues were within normal size limits (R. 609).

Dr. Rosen and Physician's Assistant ("P.A.") Mikey examined Plaintiff on December 18, 2007, relative to her October, 2007, anterior cervical discectomy. Plaintiff reported paresthesias in her fingers, bilaterally; leg pain, bilaterally; and paresthesias to her feet. Her arm symptoms worsened with overhead reaching. Plaintiff reported she had to quit her job due to pain. Dr. Rosen found Plaintiff's x-rays showed "good alignment." Her Hoffman sign was negative; she had no clonus; her gait was steady; her reflexes were symmetrical; and she had no focal weakness, spasticity, or sensory deficits. Dr. Rosen counseled Plaintiff on the importance of smoking cessation (R. 605).

On January 11, 2008, Plaintiff informed Dr. Hahn at Tri-State Community Health Center that she had been "told by her neurosurgeon that she had an abnormality on her CXR." Dr. Hahn contacted "City Hospital" and was informed that that facility was "not aware CXR" had been completed. Plaintiff was "unable" to tell Dr. Hahn "where the CXR was done, despite [his] asking multiple times"; Plaintiff responded "Martinsburg, Morgantown, Winchester, some doctor's office." Plaintiff reported she had undergone two (2) neck surgeries the previous year and had "another planned." It was noted Dr. Rosen was "following" Plaintiff relative to her "neck pain and decrease[d] movement." Dr. Hahn noted Plaintiff demonstrated "odd demeanor; speech quivering." She was "very anxious." Her thought content and speech were within normal limits. Plaintiff's prescriptions for Albuterol, Singulair, Nexium, Spiriva, and Paxil were refilled. She was referred to pain management (R. 268-69).

Plaintiff's January 15, 2008, chest x-ray showed the "granulomas at the right lung base [were] stable and showe[ed] no interval change compared to a study of 12/28/06" (R. 602).

Dr. Hahn, of Tri-State Community Health Center, informed Plaintiff, on January 22, 2008, that she had "'granulomas at right lung base." They were "stable" and caused "no internal change." Dr. Hahn explained that the findings were "benign" and that no follow-up treatment was necessary.

Plaintiff had no shortness of breath or cough; she was "very agitated." Plaintiff asked about her referral to pain management. Dr. Hahn informed her that the referral was made on January 11, 2008, but that Plaintiff did not respond to "calls" attempted to inform her thereof (R. 266-67).

Plaintiff's January 22, 2008, MRI showed "disk herniation in the midline with associated extradural mass effect at C4-C5 level. Diffuse extradural mass effect at the C5-C6 vertebral body endplate levels with narrowing of both neural foramina" (R. 607-08).

Dr. Rosen and P.A. McFadden examined Plaintiff on January 22, 2008, relative to her October, 2007, cervical discectomy. Plaintiff experienced dysesthesia in her hands and arms, bilaterally, and neck spasm. Upon review of Plaintiff's MRI, Dr. Rosen found no spinal cord impingement. Plaintiff's sensory examination was intact; her deep tendon reflexes were 2+ and symmetrical; she had no clonus; her Hoffman was negative; her gait and station were stable; and her motor strength was 5/5. Dr. Rosen found "no further neurosurgical intervention" was to "be made" (R. 604).

On October 8, 2008, Plaintiff informed a medical professional at Tri-State Community Health Center that she was "out of all" her medications as she could not afford them. Upon examination, Plaintiff was positive for anxiety; her examination was normal as to all other systems. She was diagnosed with asthma and chronic neck and back pain (R. 262-63).

On February 17, 2009, Plaintiff was examined by a medical professional at Tri-State Community Health Center. Plaintiff stated she smoked. Plaintiff had joint and muscle pain. She was positive for asthma (R. 251). Her examination was normal. Neurologically, her strength and sensation were within normal limits. She was instructed to stop smoking and to exercise daily (R. 252).

A physician, whose signature is illegible, completed a West Virginia Department of Health and Human Resources Medical Review Team Document of Plaintiff on February 17, 2009. The doctor

noted Plaintiff "state[d] hand + arms go numbs (sic)" and she "[felt] like something in her back[,] neck." The doctor wrote that Plaintiff stated she could not afford medication for her "breathing" (R. 255). Plaintiff's mouth, teeth, nose, neck, lymphatic system, lungs, chest, heart, abdomen, neurological, and psychiatric examinations were normal. The doctor wrote that Plaintiff's deep tendon reflexes were grossly intact. Her strength was 5/5 in upper and lower extremities. The physician wrote that Plaintiff experienced chronic neck and upper back pain and that Plaintiff stated it felt as if a "mouse" was in her neck and back. The diagnoses were for chronic neck and back pain, asthma, and COPD. The doctor found Plaintiff could not work a full-time job and should receive vocational rehabilitation for "less strenuous job." Plaintiff should avoid heavy lifting and exposure to noxious fumes. The physician found Plaintiff could "return to job other than CNA" (R. 256). It was noted that Plaintiff continued to smoke and was advised to cease (R. 257).

On September 2, 2009, Plaintiff presented to a medical provider at Tri-State Community Health Center to get her prescription medications refilled. She requested a referral for pain management. Upon examination, Plaintiff's general health, skin, neck, lungs, heart, and extremities were normal. Plaintiff stated she was unable to exercise (R. 249). She was diagnosed with COPD, chronic back pain, and parathesias in her upper and lower extremities. Laboratory tests were ordered (R. 250).

Dr. Benni completed a pain management examination for Plaintiff neck and lower back pain October 6, 2009. Plaintiff reported the October 2007, anterior cervical discectomy "made no difference with regard to her pain." Plaintiff reported numbness and occasional arm weakness. She had difficulty sleeping. Plaintiff described her pain as "aching, throbbing, sharp, shooting . . . ." Her pain was not lessened by "anything." Her back pain was constant, and it radiated. She had lower extremity numbness but no weakness (R. 635). Dr. Benni noted Plaintiff was alert and oriented; she

8

was in no acute distress. Her lungs were clear. Her cranial nerves were grossly intact; she had tenderness to palpation of the cervical spine and paraspinal area. She had two (2) trigger points on the trapezius muscle on the left. She had no motor or sensory deficit in upper or lower extremities, bilaterally. Plaintiff had tenderness to palpation of the lower lumbar spine. Her straight leg raising test was negative, bilaterally. She had no tenderness to palpation of the sacroiliac joints, bilaterally. Dr. Benni diagnosed cervical, lower back, and myofascial pain. Dr. Benni provided trigger point injections to the left trapezius muscle, scheduled Plaintiff for a cervical epidural steroid injection, increased Plaintiff's dosage of Neurontin, and prescribed Vicodin (R. 636-37).

Dr. Benni completed an examination of Plaintiff on November 4, 2009. Plaintiff's chief complaint was for neck and lower back pain. Plaintiff reported the trigger point injections she had received in her left trapezius muscles on October 6, 2009, had provided "minimal" relief to her shoulder pain. Plaintiff had received cervical epidural steroid injections, which eased her pain for "only . . . a 'few hours.'" Plaintiff medicated with Vicodin, which was "helping to alleviate some of her pain." Upon examination, Dr. Benni found Plaintiff was alert and oriented, times three (3); she had unlabored respiration; her heart pulses were intact; and she could rise from a seated to standing position with no difficulty. Plaintiff was tender to palpation of her right trapezius muscle. Dr. Benni found mild tenderness to palpation of her lower thoracic and upper lumbar midline area. Dr. Benni diagnosed myofascial, cervical, and low back pain (R. 349). Dr. Benni prescribed physical therapy, continued Plaintiff's prescription for Vicodin, and discontinued Plaintiff's prescription for Neurontin (R. 350). Dr. Benni administered trigger point injections into the right trapezius muscle (R. 634).

Plaintiff reported to the emergency department of City Hospital on November 15, 2009, with complaints of ankle and knee pain. Plaintiff reported she woke at 3:00 a.m. with "sharp[,] shooting

pain in both knees and ankles" and felt she would experience "chronic giveaway" if she tried to walk. Plaintiff's lower extremities were neurovascularly intact. She was treated with Dilaudid (R. 454-55).

Dr. Scaringe-Dietrich wrote to Dr. Schweitzer[1] on November 16, 2009, relative to Plaintiff's evaluation at Fast Track Anesthesia Associates for pain management. Plaintiff reported that the trigger point injection she had received gave her seventy-five (75%) relief for twenty (20) minutes, then her pain returned. Plaintiff reported her main pain was in her knees. She stated she was unable to walk and sought treatment at an emergency department, where she was treated with Dilaudid. Plaintiff described her pain as "stinging-like rod sensation in the medial aspect of the knees, which radiate[d] into the inferior aspect of the knees." Plaintiff reported she had been active until her knee pain began. She stated she had "independent ADLs." Plaintiff reported "limited" sleep and appetite. Plaintiff reported no numbness or tingling. Plaintiff treated her pain with Hydrocodone (R. 631). Upon physical examination, Dr. Scaringe-Dietrich found Plaintiff was alert and oriented and slightly anxious. She had good range of motion in her back; no tenderness to palpation over the "midline, facets, SI joints and musculature; negative straight leg raising test; negative Lasegue's sign; normal sensation and motor functions in her lower extremities; tenderness over the medial collateral ligaments of her knees; some mild spasticity of her left patella; and limited range of motion of her left knee (R. 531-32). Dr. Scaringe-Dietrich diagnosed multiple arthralgias and tendonitis of medial collateral ligaments of her knees. Dr. Scaringe-Dietrich provided Plaintiff a sample of Voltaren gel for topical application and an injection of Marcaine and Depo-Medrol into the right medial collateral ligament (R. 632).

_____

[1]This medical provider's name is spelled differently within the record. Jeannette Sweitzer, CRNP, wrote an October 10, 2008, that read that Plaintiff was a patient at Tri-State Community Health Center (R. 261). Here, the person is referred to as a doctor. Later in the record, this person is referred to as "Dr. Switzer."

Dr. Scaringe-Dietrich wrote to Dr. Switzer on December 9, 2009, relative to Plaintiff's evaluation at Fast Track Anesthesia Associates for pain management. Plaintiff stated she experienced pain in her neck and lower back. Plaintiff stated she had realized three (3) hours of relief from injections. Plaintiff stated she experienced numbness in all four (4) extremities. Plaintiff had been participating in physical therapy. Dr. Scaringe-Dietrich noted Plaintiff medicated with Prednisone, Amoxicillin, and Hydrocodone. Dr. Scaringe-Dietrich further noted she had "receive[d] a phone call that [Plaintiff] was selling 50% of her medications." Plaintiff reported her appetite was good; her activity level and sleep were low due to pain. Dr. Scaringe-Dietrich found, upon examination, that Plaintiff was alert and oriented; she had an antalgic gait; she did not use an assistive device; she had good range of motion in her neck with pain; she had neck spasms; she had negative compression and retraction of the neck; she had negative facetal tenderness; she had good range of motion in her back; she had no tenderness to palpation at "midline, facets, SI joints and musculature"; her knees had good ranges of motion; and "she had no tenderness to palpation over the medial lateral collateral ligaments over the joint line" (R. 629). Dr. Scaringe-Dietrich diagnosed diffuse degenerative joint disease, resolved knee tendonitis, low back pain, neck pain, facet arthropathy, and myofascial pain disorder (R. 629-30). Dr. Scaringe-Dietrich prescribed Vicodin and instructed, based on "the tip off about her possible selling her medications," that she was "not to escalate the dose or run out of it early." Dr. Scaringe-Dietrich informed Plaintiff that if she got "another report of her selling any of her medication, she [would] be weaned off the opioids completely." Plaintiff signed a narcotic agreement. She was instructed to continue physical therapy (R. 630).

Dr. Scaringe-Dietrich wrote to Dr. Switzer on January 4, 2010, relative to Plaintiff evaluation at Fast Track Anesthesia Associates for pain management of her neck and back pain. Plaintiff stated

her "main pain" was in her right back, and it radiated into her legs, bilaterally. Plaintiff described her pain as "sharp, shooting, burning, aching, stabbing and throbbing." Activity and sleep exacerbated Plaintiff's symptoms. Plaintiff reported Flexeril was "not helpful" and Vicodin was "mildly beneficial." Plaintiff had no knee pain "since the injection." Upon examination, Dr. Scaringe-Dietrich found Plaintiff was alert and oriented. Her back examination was "without pain with extension, flexion or rotation." She had no tenderness over the midline facets of SI joints. Her straight leg raising test was negative, as was her Lasegue's sign and Patrick's testing. Plaintiff had normal sensation and motor function of her lower extremities. Dr. Scaringe-Dietrich noted Plaintiff was "focused on her opioids." Dr. Scaringe-Dietrich diagnosed chronic low back pain, chronic neck pain, myofascial pain disorder, lumbar degenerative disk disease, and lumbar facet arthropathy (R. 627). Dr. Scaringe-Dietrich noted that, "given her irregularity with the opioids, we will not proceed with any interventional techniques." She was prescribed Vicodin and Robaxin. Plaintiff was instructed to "do stretches of the back, as well as heat applications." Dr. Scaringe-Dietrich noted she would "slowly wean [Plaintiff] off the opioids given the opioid irregularity as mentioned on her last visit" (R. 628).

Dr. Que noted, on January 7, 2010, that Plaintiff was anxious; she was positive for insomnia. Plaintiff reported mid back pain. She was positive for a cough (R. 412). She had no wheezes. Plaintiff's gait was normal. She had no spine tenderness. Her strength in the lower extremities was 5/5 (R. 413). Dr. Que noted Plaintiff's COPD was not exacerbated and prescribed Spiriva and Singulair. Dr. Que counseled Plaintiff to stop smoking and ordered a thoracic spine x-ray (R. 414).

Plaintiff's January 7, 2010, thoracic spine x-ray showed questionable "Schmorl's node at the inferior end plate of T7" (R. 402, 470).

12

On January 21, 2010, Plaintiff requested that Dr. Que provide a referral for a MRI because the doctors at the pain clinic requested one. She stated her back pain was "moderate, constant, sharp/stabbing" (R. 410). Her gait was normal. She had "full motor strength." She had no muscle spasm. He ordered a MRI and instructed Plaintiff to continue treatment at the pain clinic (R. 411).

Dr. Scaringe-Dietrich wrote a letter to Dr. Switzer on February 3, 2010, relative to Plaintiff' treatment for pain at Fast Track Anesthesia Associates. Plaintiff reported pain as ten (10) on a scale from one-to-ten (1-10). Plaintiff described her pain as "sharp, shooting, burning, aching, stabbing, throbbing, and associated with pins and needles and constant spasms." Plaintiff reported her appetite was fair; her sleep and activity level were poor; and she shook constantly. Upon examination, Dr. Scaringe-Dietrich found labile mood, odd affect, tremors, back pain with extension and rotation, bilateral SI joint tenderness, mildly positive bilateral Patrick's testing, negative straight leg raising test, negative Lasegue's sign, decreased motor function in lower extremities, normal sensation, and "supple muscular and non-tender . . . palpation of the muscles" (R. 624). Dr. Scaringe-Dietrich diagnosed chronic back pain, sacroiliitis secondary to psoriasis, lumber facet arthropathy, and myofascial pain. Plaintiff requested a MRI; Dr. Scaringe-Dietrich "noted that does not meet the criteria for an MRI, as I do not believe that there is a radicular component to the pain based on her history and physical examination." Dr. Scaringe-Dietrich ordered a lumber spine and pelvis x-rays. She scheduled Plaintiff for a bilateral SI joint injection, continued Plaintiff's prescription for Vicodin and Robaxin, and requested a review of Plaintiff's emergency department visits for the past month (R. 625).

Plaintiff's February 9, 2010, lumbar x-ray showed "mild sclerotic facet disease at L5-S1 slightly worse on the right than the left" (R. 638). The x-ray of her pelvis was normal (R. 639).

Dr. Scaringe-Dietrich injected Plaintiff's sacroiliac joint on March 1, 2010 (R. 622-23).

Plaintiff requested that Dr. Que refer her for psychiatric care for anxiety and stress on March 2, 2010. Dr. Que noted Plaintiff smoked two (1) packages of cigarettes per day. She had no wheezing (R. 408). Dr. Que counseled Plaintiff relative to smoking cessation. He prescribed Singulair and referred Plaintiff to East Ridge for psychiatric counseling (R. 409).

On March 17, 2010, Dr. Scaringe-Dietrich wrote a letter to Dr. Switzer relative to Plaintiff's reevaluation of her pain at the Fast Track Anesthesia Associates. Dr. Scaringe-Dietrich wrote Plaintiff had realized one-hundred (100) percent improvement "in her pain for 2 full hours" after her SI injection two weeks earlier. Plaintiff reported radiating pain in her low back and pain "across neck and arms." Plaintiff described her pain as "everything from sharp, shooting, burning, aching, stabbing, throbbing and associated with pins and needles and it is nonspecific." Plaintiff reported fair appetite and poor sleep. Plaintiff continued to medicate with Hydrocodone and Robaxin, and she "note[d] good benefit with" these medications. She had no side effects to the medication. Plaintiff began medicating with Zocor and reported "mild headaches." Dr. Scaringe-Dietrich's examination of Plaintiff revealed back pain with "extension greater than rotation and flexion"; tenderness over the bilateral SI joints; bilateral L5-S1 joint tenderness; mildly positive Patrick's testing; negative straight leg raising; negative Lasegue's sign; and normal sensation and motor function in the lower extremities. Dr. Scaringe-Dietrich reviewed Plaintiff's February 9, 2010, lumbar spine x-ray, and noted it showed "mild sclerotic facet disease at L5-S1 right greater than left" (R. 620). Dr. Scaringe-Dietrich diagnosed chronic low back pain, lumbar facet arthropathy, sacroiliitis, myofascial pain disorder, neck pain, and opioid analgesic "with some elements of misuse" in the past (R. 620-21). Dr. Scaringe-Dietrich ordered a urine drug test, instructed Plaintiff to continue medicating with Hydrocodone, refilled Plaintiff's prescription for Robaxin, and scheduled lumbar facet injections (R. 621).

Dr. Scaringe-Detrich administered bilateral L4-L5 and L5-S1 intraarticular facet blocks to Plaintiff on March 22, 2010 (R. 618-19).

Plaintiff presented to Dr. Padilla on April 19, 2010, for a follow-up examination of her March 22, 2010, bilateral L4-5 and L5-S1 lumbar facet diagnostic injection. Plaintiff reported that the "sacroiliac joint injection did help her more" than the lumbar facet injection. Plaintiff reported she continued to medicate with Hydrocodone. She did not sleep well. She experienced a "shooting sensation in the left posterior aspect of her calf"; however, she had no leg weakness. Plaintiff "mainly complain[ed] of sharp, shooting, burning, aching, stabbing, throbbing, pins and needle-type pain." Due to "opioid analgesic misuse," Plaintiff was under an "opioid agreement." Dr. Padilla found Plaintiff's neck was supple; her chest and lungs were clear to auscultation; her extremities had "good strong and equal pulses throughout" and were without edema; she could toe and heel walk; her straight leg raising test was negative in both the supine and sitting position; her neurologic exam was grossly intact; and her Patrick's test was equivocal on left and right. Plaintiff's bilateral SI joints revealed tenderness and she was "positive for prep compression test for sacroiliac joint pain" (R. 616). Dr. Padilla diagnosed chronic low back pain, bilateral sacroiliitis, lumbar facet arthropathy, myofascial pain, chronic cervical neck pain, and opioid analgesic misuse in the past (R. 616-17). Dr. Padilla ordered a urine drug screen, prescribed Hydrocodone and Neurontin, discontinued Robaxin, and scheduled a bilateral SI joint injection (R. 617).

Plaintiff's April 21, 2010, x-ray of her sacroiliac joints was normal (R. 468).

Dr. Padilla injected Plaintiff bilateral sacroiliac joint with Bupivacaine and DepoMedrol on May 13, 2010 (R. 614-15).

Psychologist Harold D. Slaughter completed a psychological evaluation of Plaintiff on May 26, 2010, upon referral from the West Virginia Department of Health and Human Resources. Plaintiff was reserved and cooperative. Plaintiff reported she had asthma, which she treated with Albuterol and Singulair; had acid reflux, which she treated with Nexium; and COPD. Plaintiff stated she experienced back pain due to a 1989 automobile collision. Plaintiff reported she experienced "pain throughout her extremities and back, numbness, headaches, and constant shaking." Plaintiff reported her 2007 anterior cervical discectomy and fusion had "not helped" her symptoms. Plaintiff experienced memory loss due to being treated with morphine after her 2007 surgery and a pinched nerve in her neck. Mr. Slaughter noted Plaintiff had completed a psychological evaluation in May 2009, which showed the following: full scale IQ - 66; standard score of 87 for reading; standard score of 63 for math; grade equivalent of 9.8 for reading; grade equivalent of 3.0 for math. He noted Plaintiff was assessed with alcohol abuse, anxiety disorder (not otherwise specified ("NOS") and by history) and borderline intellectual functioning by the evaluator. Plaintiff reported she had been hospitalized for attempted suicide at age twenty-one (21) and was "on the waiting list at Shenandoah Behavioral Health to begin counseling" (R. 394).

Plaintiff reported she had smoked cigarettes since the age of twenty-one (21); she smoked one-half (½) packages per day. She had drunk five (5) or six (6) liquor drinks per night from 2001 to 2009. Plaintiff currently drank one (1) or two (2) beers per month. Plaintiff had been incarcerated three (3) times: once for assaulting her sister, once for driving under the influence, and once for public intoxication. Plaintiff described her activities of daily living as follows: "piddle[d] around the house or watch[ed] television" when she woke; she "constantly switch[ed] from sitting to standing and

walking to relieve back pain"; and she had difficulty falling and staying asleep. Plaintiff used to camp and ride horses but could no longer participate in those activities (R. 394).

Plaintiff reported she quit school in the eleventh grade due to pregnancy. She had received speech therapy for stuttering. She received special education services until she was in high school. She earned her GED then a Certified Nursing Assistant Certificate. When Plaintiff was fifteen (15) years old, she was evaluated by the public school system and the results were that she had the mental age of thirteen (13); standard score of eighty-six (86) (indicating low-average intellectual functioning); and standard reading score of eighty-eight (88), arithmetic score of eighty-four (84); and spelling score of eighty (80). At age fourteen, her IQ was seventy-four (74) (R. 394).

Upon examination, Mr. Slaughter found Plaintiff was oriented to person, place, time, and circumstance. She demonstrated "significant shaking and tremors." Her speech was relevant and coherent; her affect was flat; and her mood was withdrawn. Mr. Slaughter found Plaintiff demonstrated "no indication of serious emotional issues such as thought disorder, hallucinations" and no short-term or long-term memory problems. On the Wechsler's Abbreviated Scale of Intelligence ("WASI"), Plaintiff scored the following: Verbal IQ 67, Performance IQ 63, Full Scale IQ 63 (R. 395). On Wide Range Achievement Test, Fourth Edition ("WRAT-4"), Plaintiff scored grade 4.3 in word reading and grade 3.0 in math computation (R. 395-96). Her Plaintiff's math score was consistent with "last year's score," according to Mr. Slaughter; however, her reading score had "dropped significantly," and "the reason for the decrease [was] unknown" (R. 396).

Mr. Slaughter diagnosed the following: Axis I - alcohol abuse and anxiety disorder, NOS and by history; Axis II - borderline intellectual functioning, and, by self-report, asthma, COPD, acid reflux, and spinal stenosis; Axis IV - none; and Axis V - GAF 42 (R. 396).

Plaintiff informed Dr. Que on June 7, 2010, that she experienced severe mid back pain; Paxil was not "helping w/ mood/anxiety." Plaintiff had no wheezing (R. 406). Dr. Que observed Plaintiff was 'able to sit erect on exam table" and "able to ascend/descend exam table [without] difficulty." She had no limp and her gait was normal. Plaintiff was anxious. Dr. Que referred Plaintiff to pain management for her back pain; he prescribed Celexa (R. 407).

On June 8, 2010, Plaintiff was treated at Shenandoah Preventative Medicine for complaints of right arm stiffness, back spasm, leg numbness, and bilateral hand weakness (R. 436). She was referred to Dr. Varga for a neurological consultation (R. 437).

Dr. Varga completed a neurological examination of Plaintiff on July 20, 2010. Plaintiff's chief complaints were for pain. Plaintiff stated her symptoms had not been alleviated with surgery. She continued to experience spasms in her shoulders and lower back. Her symptoms included tingling, burning pain, and numbness. Plaintiff had no lower or upper extremity weakness, bilaterally. Plaintiff did not have difficulty walking. Plaintiff medicated with Celexa and Zocor (R. 417). Upon examination, Dr. Varga found Plaintiff was in distress. Her "general level" of motor activity was normal. Dr. Varga's examinations of Plaintiff's head, eyes, and cardiovascular system produced normal results. Plaintiff was oriented, times four (4). Her immediate, recent, and remote memories were intact. Her language and attention were normal. Her fund of knowledge was appropriate. Her cranial nerves were intact. Plaintiff's motor examination showed strength at 5/5, no atrophy, and normal tone and movements. Her reflexes were normal. She had negative Romberg. Sensation was intact as to pin prick. She had no limb ataxia. Her heel, toe, and tandem gait were without difficulty. Plaintiff's gait was antalgic. She "mov[ed] from one position to another" because she could not "get comfortable" (R. 418). Her neck examination showed no Spurling's. She had diffuse tenderness or

her paravertebral muscles. She had good ranges of motion, but she experienced pain. She was "tender along PSIS." Her straight leg raising test was negative; she had no sciatic notch tenderness. Dr. Varga assessed chronic pain syndrome, cervical spondylosis, cervical radicular symptoms, and lumbago. Dr. Varga ordered sensory and motor nerve conduction studies and an electromyograph ("EMG"). Dr. Varga prescribed Amitriptyline. Dr. Varga instructed Plaintiff to return for treatment when her medical testing was completed (R. 419).

Plaintiff's August 3, 2010, EMG and nerve conduction studies showed decreased conduction velocity of the right median nerve and right medial palmar. The remaining nerves were normal. The needle evaluation of Plaintiff right and left deltoids and right and left biceps showed "slightly increased polyphasic potentials and recruitment." All remaining muscles showed "no evidence of electrical instability." The interpretation of the test was as follows: "EDX findings are most consistent with chronic bilateral C 5-6 radiculopathies (no activities)" (R. 420).

Plaintiff's August 18, 2010, EMG and nerve conduction studies showed reduced amplitude of the right tibial motor nerve and prolonged distal peak latency of the right sural sensory nerve. All remaining nerves were normal. The interpretation was for "[u]nremarkable EDX findings in the LEs. Consider musculoskeletal, arthritic etc etiology" (R. 422).

Plaintiff returned to Dr. Varga on August 23, 2010, who noted that Plaintiff's tests for her lower extremities were unremarkable and the tests for her upper extremities showed chronic bilateral C5-6 radiculopathy "without current activities" (R. 424). Plaintiff's examination results of July 20, 2010, were unchanged except she was "emotionally labile with review of test results" (R. 425-26). Dr. Varga diagnosed chronic pain syndrome, cervical spondylosis, chronic cervical radiculopathy at C5-6 and "no activity on EDX." Dr. Varga "consider[ed] referral" to pain management and increased

Plaintiff's dosage of Elavil. Dr. Varga ordered a MRI of the brain due to paresthesias in all extremities, fatigue, and depression, and to rule out multiple sclerosis (R. 426).

Plaintiff's September 7, 2010, cervical MRI showed the following: at C2-C3, left sided disc osteophyte complexes without "significant spinal or neural foraminal stenosis"; at C3-C4, left sided disc osteophyte complexes, which caused moderate left sided neural foraminal stenosis but no significant spinal stenosis; at C4-C5, broad disc osteophyte complexes, which caused moderate spinal stenosis and moderate left sided neural foraminal stenosis; at C5-C6 and C7-T1, no significant disc disease; and an unremarkable cervical cord. The impression was "moderate degenerative disc disease at multiple levels as described above, causing spinal and neural foraminal stenosis." It was noted that Plaintiff's "status post anterior fusion of C5 and C6 [was] in anatomical alignment" (R. 428).

Except for a pineal cyst, Plaintiff's September 7, 2010, brain MRI was normal (R. 429).

Plaintiff's September 9, 2010, MRI of her lumbar spine showed mild bilateral facet disease at L5-S1, no spinal canal stenosis, and no other abnormalities (R. 430).

Dr. Varga examined Plaintiff on September 14, 2010. Plaintiff stated her cervical spondylosis symptoms had not been "helped" by her surgery. She continued to experience muscle spasms in her shoulders and lower back. She experienced tingling and burning pain in her neck and arms and numbness in her hands and feet. She reported no lower or upper extremity weakness; she had no difficulty walking. Plaintiff stated she experienced chronic C5-C6 radiculopathy and paresthesias in her hand and arms. Plaintiff stated she had paresthesias in her neck on the right side; however, Dr. Varga noted Plaintiff's "MRI indicate[d] LEFT sided NF stenosis at 3-4, 4-5 NOT right sided." Plaintiff reported Elavil was not "helping" her symptoms. Plaintiff stated she had no "lumbago" complaints. Plaintiff stated she was fatigued "'all the time.'" She had "some memory and

concentration problems." She had no headaches. Dr. Varga reviewed Plaintiff's cervical, lumbar, and brain MRIs and upper and lower extremities x-rays (R. 431). Dr. Varga found Plaintiff was alert; her posture was normal; her "general level of motor activity" was normal; but she was in distress. Plaintiff's extremities were "symmetrical without trophic changes, pulse deficits, edema or cyanosis." Her mental examination showed she was oriented, times four (4). She was attentive; her language was normal; her recent, remote, and immediate memories were intact; her fund of knowledge was appropriate; her cranial nerves were intact. Plaintiff's motor examination was normal; her motor strength was 5/5; her reflexes, sensation, and cerebellar function were normal. Plaintiff's gait was antalgic and her station was normal. Dr. Varga diagnosed myofascial pain syndrome; cervical spondylosis; and chronic cervical radiculopathy at C5-C6. Dr. Varga referred Plaintiff to Dr. Burgess for "further management." Dr. Varga increased Plaintiff's dosage of Elavil and prescribed Neurontin (R. 433).

Dr. Withuhn examined Plaintiff on March 28, 2011. Plaintiff stated she had "been off meds [COPD] since 1/2011." Plaintiff reported dyspnea was aggravated by fumes and relieved by nebulizers (R. 546). Plaintiff reported brain cysts, headaches, and "black floaters." She had no muscular weakness (R. 547). Plaintiff smoked one-half (½) package of cigarettes per day; she reported no history of alcohol abuse (R. 548). Plaintiff stated she was fatigued and had generalized weakness, night sweats, snoring, cough, wheezing, decreased appetite, and insomnia (R. 549-50). Upon examination, Dr. Withuhn found Plaintiff's neck was supple; her thyroid was not enlarged; she had wheezing with auscultation; and she had normal lymphatic, cardiovascular, and abdominal examinations (R. 551). She was alert and oriented; she had no calf tenderness; she was anxious; she was fearful; she felt hopeless; and she had poor insight and judgment (R. 551-52). Dr. Withuhn found

Plaintiff had normal knowledge and language; her speech was not pressured; she had no suicidal ideations. Plaintiff reported she had "tried all muscle relaxants" for treatment of chronic pain syndrome, but "all failed." He treated her asthma with Albuterol, from which Plaintiff got "good response." He prescribed Zoloft, Tramadol, Proair, Nortriptyline, and Zoloft (R. 552).

On May 2, 2011, Plaintiff informed Dr. Withuhn she had experienced a "warm feeling" in her left arm, confusion, difficulty remembering, a "tight feeling in back," headaches, insomnia, and an "'out of body' sensation." She was not "feeling better on Symbicort"; she continued treating COPD with Proair (R. 554). Dr. Withuhn noted Plaintiff was a "former tobacco user." She experienced fatigue and cough (R. 555). Upon examination, Dr. Withuhn found Plaintiff was anxious, slightly confused, and oriented (R. 556-57). Plaintiff's short-term memory was slightly impaired, her gait and balance were intact; she had no motor weakness; her coordination was not impaired; her speech was normal; her chest and respiratory examinations were normal; her affect was normal (R. 557-58). Dr. Withuhn "suspect[ed]" Plaintiff's confusion was caused by sinusitis. He prescribed Keflex, Prednisone, Symbicort, Albuterol, Tramadol, Nortriptyline, and Proair (R. 558-59).

Plaintiff presented to Dr. Withuhn on September 15, 2011, for a follow-up examination from her emergency room visit. Plaintiff described her symptoms as right kidney cyst, abdominal pain, and "shooting" pain in her groin. These symptoms remained unchanged. Plaintiff stated her neck pain was "'cutting'" and was getting worse (R. 560). Dr. Withuhn noted Plaintiff's medical test history (R. 561). Dr. Withuhn noted Plaintiff stopped smoking in 2011 (R. 562). Dr. Withuhn's examination of Plaintiff showed a cough, dyspnea, and wheezing; edema in her hands and feet; thyroid enlargement of left lobe; posterior spine tenderness; and pain with ambulation (R. 563-64). Dr. Withuhn

"suspect[ed]" Plaintiff passed a kidney stone (R. 564). He prescribed Nortriptyline, Tramadol, Hydrocodone, Proair, Symbicort, Aeroeclipse, and Albuterol (R. 565).

Plaintiff's September 22, 2011, thyroid ultrasound showed a nodule in the right lobe (R. 530).

Plaintiff returned to Shenandoah Preventative Medicine on September 28, 2010, for treatment of neck and shoulder pain. Plaintiff stated she would "try to consult" with "neurosurgery" (R. 437).

On November 17, 2011, Harry W. Hood, M.S., completed a mental status examination of Plaintiff. Mr. Hood noted Plaintiff "appeared" to be experiencing "significant levels of pain and mild mobility impairments." She had no permanent residence (R. 479). Plaintiff stated she was applying for benefits due to "'constant headaches; arm, leg and back numbness; COPD; mood swings; and . . . anxiety and depression.'" Plaintiff reported daily crying, low energy, poor self esteem, sleep disturbances, elevated anxiety, panic attacks, and suicidal thoughts. Mr. Hood reviewed Mr. Slaughter's May 2010 psychological evaluation of Plaintiff. Plaintiff stated her medical conditions included cysts in her brain, lungs, and kidneys; thyroid problems; and cervical plates and screws. Plaintiff stated she smoked six (6) or seven (7) cigarettes per day. She medicated with Nortriptyline, Tramadol, Zoloft, Symbicort, and Albuterol inhaler and nebulizer (R. 480). Plaintiff reported she used to drink six (6) or seven (7) alcohol drinks per day. She completed eleventh grade of high school and secured her GED in 1995 or 1996. She was "able to pass the CNA examination in approximately 2005 or 2006." Plaintiff had, in the past, been charged with assault, DUI, and public intoxication (R. 481).

Upon examination, Mr. Hood found Plaintiff was cooperative; her speech was clear; she was oriented, times four (4); her mood was "depressed and anxious"; her affect was restricted; her thought process and content were normal; her perception was normal; Plaintiff's insight was fair; her judgment was below average; she had suicidal thoughts, but no plans; she was not homicidal; her immediate

memory was normal; her recent memory was severely deficient; her remote memory was moderately deficient; her concentration was moderately deficient; her psychomotor behavior was "positive for agitation and movement"; and her persistence and pace were normal. Mr. Hood found Plaintiff's social functioning was mildly impaired. Plaintiff rated her social functioning as below average because she avoided people and could not do "things" others could do (R. 481). Plaintiff reported her daily activities as follows: rose between 4:00 a.m. and 5:00 a.m. and "'prance[d]' through the house." She lay down then rose again and sat. She spent the "whole day trying to get comfortable moving between different activities." She retired between 9:00 p.m. and 10:00 p.m. Her sleep was "severely disturbed due to pain and her mind not being able to rest" (R. 482).

Mr. Hood made the following diagnoses: Axis I - depressive disorder and anxiety disorder, NOS, and pain disorder; Axis II - borderline intellectual functioning, by history; and Axis III - multiple physical impairments. Mr. Hood provided the following rationale for his diagnoses: depressive disorder diagnosis was based on observed depressed mood, frequent crying, low energy, low self esteem, sleep disturbances, and suicidal thoughts; anxiety diagnosis was based on observed levels of anxiety during the interview and Plaintiff's reported panic attacks; the pain disorder diagnosis was based on a "direct relationship between the levels of pain she experience[d] and her mood as well as anxiety-related symptoms that appear to be exacerbated by her pain"; and borderline intellectual functioning diagnosis was based on a review of her history. Plaintiff's prognosis was "poor" because she was not in treatment. She could, according to Mr. Hood, manage her own finances (R. 482).

Philip E. Comer, Ph.D., completed a Psychiatric Review Technique of Plaintiff on November 21, 2011 (R. 485). He found her organic mental disorder was borderline intellectual functioning (R. 486). Her affective disorder was depressive disorder, NOS (R. 488). Plaintiff's anxiety related

disorder was identified as anxiety disorder, NOS (R. 490). Dr. Comer found Plaintiff's somatoform disorder was pain disorder with both psychological and pain features (R. 491). Dr. Comer found Plaintiff had mild limitations in her activities of daily living and social functioning and moderate difficulties in her ability to maintain concentration, persistence, or pace. Dr. Comer found Plaintiff had experienced one (1) or two (2) episodes of decompensation (R. 495). Dr. Comer reviewed Plaintiff's record, including the findings of Mr. Hood (R. 497).

Dr. Comer completed a Mental Residual Functional Capacity Assessment of Plaintiff on November 21, 2011. In the "Understanding and Memory" category, Dr. Comer found Plaintiff was not significantly limited except she was moderately limited in her ability to understand and remember detailed instructions (R. 499). She was moderately limited in three areas of the "Sustained Concentration and Persistence" category: ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She was not significantly limited in the remaining five areas (R. 499-500). Dr. Comer found Plaintiff had no significant limitations in any area of the "Social Interaction" category. Plaintiff was not significantly limited in any area of the "Adaption" category except she was moderately limited in her ability to respond appropriately to changes in the work setting (R. 500). Dr. Comer found Plaintiff's statements were "reasonably consistent with CE and treatment records and [were] credible from her perspective. However, she appear[ed] to have the mental/emotional capacity for simple[,] routine work like activity in a work environment that can accommodate her physical limitations" (R. 501). Dr. Comer noted his assessment was "in general accord with ALJ decision of 08/20/10" (R. 503).

Plaintiff's November 22, 2011, pulmonary function test showed "minimal obstructive airways disease" (R. 541-43).

On November 26, 2011, Plaintiff reported to P.A. Garneau and Dr. Pettrone at the emergency department of City Hospital that she had been assaulted by her sister and her sister's friend (R. 510, 517). She had been at the "local American Veterans' building" and had had three (3) drinks. Her sister "punched her multiple times in the face and chest." Plaintiff reported headaches, neck pain, and bilateral rib pain. Plaintiff reported she smoked one-half (½) package of cigarettes per day and drank alcohol occasionally (R. 510). Her neck was nontender to palpation. She had full ranges of motion and normal strength in all extremities. Plaintiff's CT scan of her head and brain were normal; the CT scan of her neck showed status post C5-C6 fusion; the facial CT scan showed left nasal bone fracture (R. 511, 526-29). She was discharged to home and instructed to treat her symptoms with Tylenol and Motrin and the "pain medication at home" (R. 512, 517-19).

Dr. Webb completed a disability determination examination of Plaintiff on November 28, 2011. Plaintiff reported she had asthma. She wheezed daily. Her symptoms had worsened during the past ten (10) years. On "some days" she became breathless "just walking from room to room." On a "good" day, she could walk one (1) block. She has "nodules on her chest x-ray." She had been "sitting up for years now," because, if she lay down, she was "more breathless and her cough is worse." Plaintiff reported intermittent arm and finger numbness, bilaterally, and neck pain and stiffness (R. 536). She could not lift her arms above her chest level; she was unable to lie in the supine position or lie on her side because the pain and numbness worsened. Standing to do any kind of housework worsened her symptoms. She experienced back numbness that radiated to her legs, feet, and toes. She could sit for fifteen (15) minutes. Physical therapy and "injections" did not relieve those

symptoms. Dr. Webb was "unable to get a clear history of Lhermitte's," but Plaintiff reported an "electric shock like feeling, which radiate[d] from the top of her head all the way down to her feet" (R. 537). Plaintiff reported she medicated with Symbicort, Tramadol, Nortriptyline, Sertraline, and Hydrocodone. She smoked one (1) package of cigarettes every two (2) or three (3) days and drank occasionally. She completed eleventh grade, obtained her GED, worked as a store manager, and obtained her CNA. She "lost" her house in 2007 and lived with a daughter or friend (R. 537). She had weight loss; she ate one (1) meal a day. She was depressed, her memory was poor, she had suicidal thoughts, she cried, and she slept a few hours at a time. She had chronic headaches and cervical spine problems (R. 538).

Upon examination, Dr. Webb found Plaintiff's head, ears, eyes, neck, throat, chest, lungs, heart, and abdomen were normal. Her right thyroid felt slightly irregular. Her right arm reflexes and right knee and ankle reflexes were more active than her left. Her Hoffman's and Babinski's signs were normal. Plaintiff could squat eighty (80) degrees. She could walk on her heels and toes. She "resisted any range of motion of the neck and [Dr. Webb] could not do a Spurling's maneuver due to pain and stiffness." Plaintiff's ranges of motion of her upper extremities were normal except she had 160 degree abduction of her shoulders and 30 degrees adduction and internal shoulder rotation. Plaintiff had good upper extremity strength and normal fine manipulation of her fingers. In her cervical spine, Plaintiff had 20 degrees lateral flexion, 10 degrees flexion and extension, and 70 degrees lateral rotation. In her lumbar spine, Plaintiff had 80 degrees flexion and 15 degrees lateral flexion. Dr. Webb found Plaintiff had good strength in her legs; her gait was stable. Dr. Webb's impressions were as follows: chronic pain syndrome; history of allergic airways disease, depression, anxiety, panic attacks, sleep disorder, kidney stones, hematura, pulmonary nodules; probable chronic lung disease;

chronic headaches; and tremulousness and restless as a result of "possible narcotic withdrawal symptoms as she has been out of her hydrocodone for a week or so"(R. 539).

Plaintiff presented to Dr. Withuhn on December 5, 2011, with complaints of severe neuropathy and radiculopathy. Plaintiff reported her "pain specialists" thought her conditions would be "lifelong." Plaintiff described her pain as "shocking/shooting/burning" in legs and arms, bilaterally. Plaintiff experienced headaches and memory loss. She had shortness of breath (R. 567). Dr. Withuhn noted Plaintiff smoked one-quarter (1/4) of a package of cigarettes per day (R. 569). Plaintiff was positive for nasal congestion and drainage, dyspnea, anxiety, depression with occasional suicidal thoughts, and allergies (R. 570-71). Upon examination, Plaintiff's eyes, ears, nose, mouth, throat, lymphatic system, respiratory system, cardiovascular system, and abdomen were normal, except for a cough. She was positive for posterior spine tenderness, crepitance and shooting pain with range of motion of her neck and lumbar region, and paresthesias. Plaintiff reported feeling "pins and needles" in both arms and legs. Dr. Withuhn noted Plaintiff demonstrated no "unusual anxiety or evidence of depression." Dr. Withuhn noted Plaintiff's neuropathy was "severe, persistent, severely impact[ed] quality of life" (R. 572-73). Plaintiff's radiculopathy was caused by "disk osteophyte complexes." Plaintiff's asthma was controlled on her current regimen. Dr. Withuhn referred Plaintiff to a psychiatrist for depression. He prescribed Propranolol, Nortiptyline, Flexeril, Tramadol, Hydrocodone, Proair, Symbicort, Aeroeclipse, and Albuterol (R. 574).

Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff on December 13, 2011. Dr. Lateef found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for about six (6) hours in an eight (8) hour workday; and push/pull

unlimited (R. 585). Dr. Lateef found Plaintiff was occasionally limited in her ability to climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. Dr. Lateef found Plaintiff should never climb ladders, ropes, or scaffolds (R. 586). Dr. Lateef found Plaintiff had no manipulative, visual, or communicative limitations (R. 487-88). Dr. Lateef found Plaintiff's exposure to wetness, humidity, and noise was unlimited. She should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid even moderate exposure to hazards (R. 588). Dr. Lateef found Plaintiff was partially credible in that there existed a "degree inconsistent w/exam findings in MERs/CE report" (R. 589). Dr. Lateef reduced Plaintiff's RFC to light and noted agreement with "ALJ decision of 8/20/2010" (R. 590).

Plaintiff presented to Dr. Withuhn on February 3, 2012, with complaints of muscle pain, muscle tightness, stinging in her muscles, low back and neck pain radiating to both legs, and arm and leg soreness. Plaintiff reported she could walk (1) city block. She continued to smoke (R. 656). Plaintiff reported she smoked less than one (1) package of cigarettes per day and had never tried to stop smoking (R. 659). She was anxious about financial issues (R. 656). Plaintiff stated she was fatigued and chilled. She had dyspnea. She was negative for cough and wheezing (R. 660). Upon examination, Dr. Withuhn found Plaintiff had normal pulses. As to her back and spine, she was positive for posterior tenderness and paravertebral muscle spasm. Her rotation was normal and she had a negative elevated leg test. Plaintiff was positive for "mild b/l leg raise but not laying" and thoracic muscle spasms (R. 661). Plaintiff's affect was normal; she was anxious; she had "flight" ideas; she felt hopeless but had no suicidal ideations. Dr. Withuhn diagnosed myalgia, back pain neuropathy (stable), and asthma/COPD (stable) and counseled Plaintiff to stop smoking. He prescribed Flexeril, Proair, Symbicort, Propranolol, Nortriptyline, Tramadol, Aeroeclipse, and Albuterol (R. 662).

Dr. Lim completed a Physical Residual Functional Capacity Assessment of Plaintiff on February 12, 2012. Dr. Lim found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 594). Dr. Lim found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 595-97). Dr. Lim found Plaintiff had no limitations in her exposure to environmental elements except she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (R. 597). Dr. Lim found Plaintiff was partially credible (R. 600).

Plaintiff presented to Shenandoah Preventive Medicine on May 8, 2012, with complaints bilateral arm numbness, bilateral leg numbness, and bilateral hand weakness and numbness. She "lean[ed] to the left" due to low back pain. It was noted Plaintiff was prescribed Tramadol and Hydrocodone by another doctor. Movement exacerbated Plaintiff's pain; she continued to smoke (R. 650). She was diagnosed with bilateral shoulder numbness (R. 649).

Plaintiff presented to Shenandoah Preventive Medicine on May 24, 2012, with complaints low back pain with "shooting pain down to knees"; bilateral shoulder, arm, and hand weakness; and bilateral leg numbness. Movement and lifting overhead exacerbated her pain. Plaintiff smoked one and one-half (1 ½) packages of cigarettes per day (R. 647). Plaintiff was diagnosed with "tight muscles and reduced cervical lordosis. Plaintiff requested referral to pain management, but she was encouraged to consider neural therapy and massage (R. 640).

Plaintiff presented to Shenandoah Preventive Medicine on June 7, 2012, with complaints of bilateral hand weakness and low back numbness. Moving and "certain activities" exacerbated

Plaintiff's pain. Plaintiff smoked one and one-half (1 ½) packages of cigarettes per day (R. 645). Plaintiff was diagnosed with bilateral shoulder tenderness and decreased cervical lordosis (R. 646).

On July 17, 2012, Plaintiff was treated at Shenandoah Preventive Medicine for bilateral shoulder, leg, and arm numbness. Plaintiff reported she had a headache. Movement, including lifting her arms overhead, exacerbated pain. Plaintiff smoked one and one-half (1 ½) packages of cigarettes per day (R. 643). Plaintiff's examination, except for that of her musculoskeletal system, was normal; she was diagnosed with cervical lordosis (R. 644).

Dr. Withuhn examined Plaintiff on April 11, 2012, for chronic abdominal pain, hematuria, and referral to pain management (R. 664). Plaintiff reported she had moderately persistent asthma, neuropathy, degenerative disk disease, radiculopathy, generalized anxiety, and depression (R. 664). Dr. Withuhn reviewed Plaintiff's diagnostic history (R. 665-66). Plaintiff smoked one-quarter (1/4) package of cigarettes per day (R. 666). Upon examination, Dr. Withuhn found Plaintiff was not fatigued, she wheezed, she had no cough, and she was not in apparent distress (R. 667-68). Plaintiff's abdomen was normal; her affect was normal; she was not anxious; she was oriented (R. 668-69). He diagnosed back pain, C5-C6 radiculopathy, hematura, and abdominal pain (R. 669). Dr. Withuhn prescribed Flexeril, Zoloft, Cetirizine, Tramadol, Nortriptyline, Propranolol, Symbicort, Hydrocodone, Proair, Aeroeclipse, and Albuterol Sulfate (R. 670). Dr. Withuhn referred Plaintiff to Dr. Burgess for back pain, Dr. Thomas for abdominal pain, and Dr. Sabado for changes to her voice (R. 671).

Plaintiff presented to Dr. Maciunas, at Shenandoah Preventive Medicine, on July 10, 2012; she had been "without meds for about 2 months." It was noted Plaintiff had "diff excuses for why she can't make it [to] her appt w/Dr. Withuhn" (R. 672). Upon examination, Dr. Maciunas found Plaintiff had no edema. She demonstrated "no unusual anxiety or evidence of depression." Dr. Maciunas

found Plaintiff's asthma and COPD were stable, depression was chronic, and back pain was chronic (R. 674). Dr. Maciunas prescribed Hydrocodone, Zoloft, Proair, Symbicort, Flexeril, Cetirizine, Nortriptyline, Tramadol, Propranolol, Aeroeclipse, and Albuterol Sulfate (R. 675).

Dr. Sabado examined Plaintiff's neck on July 10, 2012; he could "not see or feel any specific neck masses or [] processes (except for some prominence of sub-mandibular glands)" (R. 695).

Plaintiff was treated at Shenandoah Preventive Medicine on August 23, 2012, for "all over pain." Plaintiff reported her right knee felt as if it had been "popping out of place." She had "needle feeling" in her low back and right knee. Plaintiff was using crutches for "no specific injury" (R. 641). Plaintiff's examination, including musculoskeletal, was within normal limits except for low back spasm. She was diagnosed with pain and depression (R. 642).

Plaintiff presented to Dr. Withuhn on September 27, 2012, for medication refills. Plaintiff requested a referral for "spinal injections" and "forms filled out regarding work/physical limitations." Plaintiff reported chronic low back and neck pain. It was worse with reaching, lifting, bending, and stooping. Plaintiff's pain was "mildly better with meds though nothing relieve[d] it." Plaintiff stated she needed to shift positions and sit/stand "constantly" (R. 676). Dr. Withuhn reviewed Plaintiff's past medical and diagnostic history (R. 677-79). Plaintiff's examination was normal except for weight gain and spine tenderness (R. 679-80). Dr. Withuhn diagnosed C5-C6 radiculopathy, back pain, and neuropathy. Dr. Withuhn "suggest[ed] referral to Dr. Gallagher for injections" (R. 680). Dr. Withuhn noted Plaintiff had "many limitations due to most repetitive motion or positioning increaing (sic) her chronic back pain" (R. 680-81). Dr. Withuhn prescribed Nortriptyline, Tramadol, Symbicort, Hydrocodone, Zoloft, Proair, Propranolol, Cetirizine, Aeroeclipse, and Albuterol Sulfate (R. 681).

On September 27, 2012, Dr. Withuhn completed a Medical Questionnaire to determine Plaintiff's physical capacities. Dr. Withuhn found Plaintiff could sit, stand, and walk for less than one hour each because she "need[ed] to constantly shift position/sit/walk due to her rad/sp/ or her pain will severe/worse." Dr. Withuhn found Plaintiff did not require the use of assistive devices to aid in ambulation but noted "distances up to 100-200 feet before pain [made] her sit down. Walker [was] helpful but not absolutely required." Dr. Withuhn found Plaintiff needed to alternate positions "near constantly" due to "pinched nerves." Plaintiff did not need to elevate her feet (R. 651). Dr. Withuhn found Plaintiff could not bend, stoop, crawl, climb, crouch, or kneel; she could "rarely" balance and reach. Dr. Withuhn found Plaintiff could not use her feet for repetitive movement because it would "result in [increased] pain in her back." Dr. Withuhn found Plaintiff could never lift eleven (11) to one-hundred (100) pounds. She could occasionally lift six (6) to ten (10) pounds. She could frequently lift up to five (5) pounds "as long as it [did] not involve reaching/crouching." Dr. Withuhn found Plaintiff could use her hands for simple grasping. Plaintiff could use her hands for arm controls "as long as no reaching." Plaintiff could not use her hands for fine manipulation because, according to Dr. Withuhn, Plaintiff's "hands go numb after [less than] 10 minutes of reptetive (sic) motion" (R. 652). Dr. Withuhn found Plaintiff had no loss of grip in her hands; however, she had numbness in her hands "with []/repetative (sic) motion as above." Dr. Withuhn found Plaintiff required "complete freedom to rest frequently throughout the day" as well as a sit-stand option. Dr. Withuhn found Plaintiff needed to lie down or sit in a recliner for a substantial portion of each day. Dr. Withuhn noted "objective medical findings" showed Plaintiff had a medical condition that could reasonably be expected to produce the type of pain and other symptoms he described in the questionnaire. Additionally, Dr. Withuhn noted that objective medical findings showed a medically determinable

condition that could reasonably be expected to produce the degree of pain or symptoms he described in the questionnaire (R. 653). Dr. Withuhn found Plaintiff had the limitations he noted in the questionnaire "certainly since [he] first established care with in 2011, but per pt, historically since neck surgery in 2007." Dr. Withuhn found Plaintiff's limitations were permanent. He listed his diagnoses as back pain, cervical disk disease, radiculopathy, chronic pain, and neuropathy (R. 654).

Plaintiff presented to Dr. Withuhn on October 10, 2012, seeking a referral to Dr. Gallagher for nerve block injections as she had her medical card reinstated (R. 682). Dr. Withuhn reviewed Plaintiff past medical history and diagnostic testing (R. 683-85). Upon examination, Dr. Withuhn found Plaintiff had mild "ACL laxity" in her right knee. Her right knee was also positive for mild crepitance and "clicking" with range of motion testing. Plaintiff's left knee had mild medial laxity and crepitance; her ACL was "ok" (R. 685). Plaintiff demonstrated "no unusual anxiety or evidence of depression." Dr. Withuhn diagnosed C5-C6 radiculopathy, back pain, and leg and knee osteoarthritis. Plaintiff was referred to Dr. Gallagher for nerve blocks and to Dr. Burgess for pain management. Dr. Withuhn prescribed Nortriptyline, Tramadol, Symbicort, Hydrocodone, Zoloft, proair, Propranolol, Certirizine, Aeroeclipse, and Albuterol Sulfate (R. 686). Knee x-rays were ordered (R. 687).

Dr. Burgess completed a Medical Questionnaire to Determine Physical Capacities of Plaintiff on October 24, 2012. Dr. Burgess found, as to Plaintiff's ability to sit, stand and/or walk, she would have to "alternate between each [with] 1 hr max sit, stand, walk [with] 4 hours max - combined." Dr. Burgess found Plaintiff required "other" assisting devices to aid in standing or walking; Dr. Burgess did not list the device. Dr. Burgess found Plaintiff must alternate positions frequently due to "pain build up." Plaintiff needed to elevate her feet "on occasion" (R. 700). Dr. Burgess found Plaintiff could "seldom" bend. Plaintiff could balance if she "stands too long or prolonged sitting." Plaintiff

could never, according to Dr. Burgess, stoop, crawl, climb, crouch, kneel, or reach. Plaintiff could not use her feet for repetitive pushing or pulling of leg controls. Dr. Burgess found Plaintiff could occasionally lift up to ten (10) pounds but could never lift from eleven (11) to one-hundred (100) pounds. Plaintiff could use her hands, bilaterally, for simple grasping, arm controls, and fine manipulation; however, Dr. Burgess found she was "limited with prolonged use (over 1 hr)" (R. 701). Dr. Burgess found, based upon medical signs, Plaintiff had loss of grip strength and numbness in her hands, bilaterally. Plaintiff required "complete freedom to rest frequently throughout the day." Dr. Burgess found it was necessary for Plaintiff to lie down or sit in a recliner for a "substantial period of time during the day." Dr. Burgess found that objective medical findings showed a medical condition that could reasonably produce the type of symptoms and the degree of pain described by him in the questionnaire (R. 702). Dr. Burgess found Plaintiff's limitations had existed since 2006 and they were permanent. Dr. Burgess included the following diagnoses to support his findings: cervical sprain, thoracic spasm, and lumbar spasms (R. 703).

Administrative Hearing

Plaintiff testified at the November 7, 2012 hearing, that she had difficulty breathing due to the "surgery [she] had [was] pushing up against [her] vocal cords." She smoked between no cigarettes per day to one-half (½) package. Plaintiff testified she had difficulty remembering (R. 43). Plaintiff testified she could read "some" and her writing was not "very good." She could complete simple math problems. She obtained her GED (R. 44). Plaintiff had last attended AA meetings three (3) years earlier; she had last drunk six (6) months earlier (R. 48).

Plaintiff testified she could "hardly even do" her dishes. She lay on her back "most of the time" or was reclined in a chair. Plaintiff stated washing dishes, or "even to get up to have to do the

dishes," caused arm numbness. Plaintiff stated sitting or standing caused leg numbness. Plaintiff experienced pain "through [her] entire back." She had headaches. Plaintiff could not sleep due to having to "rotate." Plaintiff testified she could not "even talk." Plaintiff used a walker; it was prescribed by Dr. Withuhn (R. 49). Plaintiff described her pain as constant. It felt like "electric shocks" or as if she were being "strangled." She had shooting pain going down her back; leg and arm tingling; and muscle burning (R. 50).

Plaintiff testified the pain medication - Hydrocodone, Nortriptyline, Flexeril - did not alleviate her pain. Plaintiff then testified she took her medication as prescribed and "plus as" she needed it. When asked again if the medication alleviated her pain, Plaintiff testified: "They'll relieve the muscles, the burning in my back, but they don't get rid of the headaches or the stinging in my nerves or the numbness in my arms and feet." Plaintiff rated her pain at ten (10) without medication and eight (8) or nine (9) with medication (R. 50-51).

Plaintiff testified she could sit or stand for ten (10) or fifteen (15) minutes. Plaintiff could walk for one (1) block before she began "hurting pretty bad." Plaintiff stated she could lift five (5) pounds. Plaintiff stated she reclined in a chair or lay in bed for more than one-half (½) of each day. Plaintiff did not shower daily because she did not "really do anything" (R. 52-53). Plaintiff's daughter manicured her nails (R. 53). Plaintiff testified she did not cook for herself because she did not "have a home to cook in." She washed dishes once per week. She did no housework (R. 54). Plaintiff testified her children did her laundry because her getting up, moving back and forth, and lifting a laundry basket caused her arms and legs to go numb, caused pain, and caused her to have a headache. Plaintiff did not have a valid driver's license as she had been charged with driving under the influence in 2007, and she had difficulty turning her neck (R. 55). Plaintiff testified she did not read "much" but

she watched "some television," approximately forty-five (45) minutes per day. She did not use the computer. She sat "around and wonder[ed] . . . why [she] deserve[d] the life" she had (R. 56). She used her phone to look at pictures once per week or every two (2) days (R. 57).

The ALJ asked the VE the following hypothetical question:

> . . . I'd like you to assume that we're considering an individual who's of the same age, with the same educational background and work experience as the claimant. . . (R. 60). All right . . . I'm going to ask you to assume . . . that the individual is occasionally able to lift up to 10 pounds - is occasionally able to lift 10 pounds and frequently able to lift up to 10 pounds, that the individual is able to stand and/or walk for four or eight hours and sit for six or eight hours, but must alternate between sitting and standing in place for up to one-half hour - every half hour. The individual is able to occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds. The individual is occasionally able to balance, stoop, kneel, crouch, and crawl. The individual is, with both hands, limited to frequent handling and grasping, and occasional feeling. The individual is to avoid concentrated exposure to temperature extremes of cold to pulmonary irritants including fumes, odors, dust, gases, and poor ventilation, and hazards including machinery and heights. Given those limitations, would the individual be able to perform any of the claimant's past work? (R. 64).

The VE responded that no hypothetical individual could do Plaintiff's past work but could perform the jobs of sedentary security guard (R. 64). When the ALJ further limited the hypothetical individual to simple, repetitive tasks, no public interaction, and no more than occasional interaction with co-workers and supervisors, the hypothetical individual, according to the VE, could still perform the work of a sedentary security guard and the job of a call-out operator (R. 65-66).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Nunez made the following findings:

1. The claimant has not engaged in substantial gainful activity since July 29, 2011, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments: cervical degenerative disc disease, chronic pain syndrome, asthma/chronic COPD, borderline IQ, anxiety disorder, and alcohol abuse (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 23).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than a full range of sedentary work as defined in 20 CFR 416.967(a). She can stand/walk for 4 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. She can occasionally and frequently lift up to 10 pounds. She requires the ability to alternate between sitting and standing every half hour. The claimant is limited to occasionally balancing, stooping, crouching, crawling, kneeling, and climbing ramps and stairs, and she should never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to extreme cold, pulmonary irritants (such as fumes, odors, dusts and gases), and workplace hazards, such as unprotected heights and moving machinery. She can perform tasks requiring frequent handling and grasping and occasional feeling. She is limited to performing simple repetitive tasks and work with an SVP of no more than 2, and she should have no interaction with the public, and only occasional interaction with co-workers and supervisors (R. 25).

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on April 23, 1967 and was 44 years old, which is defined as a younger individual age 18-44, on the date the application was filed. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not a issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969)a)) (R. 28).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 29, 2011, the date the application was filed (20 CFR 416.920(g)) (R. 29).

## IV.  DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law:  "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1. The ALJ erroneously assessed the Plaintiff's residual functional capacity.

   A. The ALJ failed to set forth a narrative discussion describing how the evidence supported her conclusions as to the RFC (Plaintiff's Brief at 5-7).

   B. The ALJ failed to properly evaluate the opinions of Plaintiff's treating physicians (Plaintiff's Brief at 7-12).

C. The ALJ failed to include any limitation as to Plaintiff's concentration, persistence, or pace in the RFC (Plaintiff's Brief at 12-13).

D. The ALJ failed to include any limitations related to Plaintiff's neck and back in the RFC (Plaintiff's Brief at 13-14).

The Commissioner contends:

1. Substantial evidence supports the ALJ's RFC assessment (Defendant's Brief at 5-9, 12-13).

2. The ALJ's decision to give little weight to the opinions of Drs. Withuhn and Burgess is supported by substantial evidence (Defendant's Brief at 9-11).

3. The ALJ fully considered the effect of Plaintiff's symptoms on her concentration, persistence, and pace (Defendant's Brief at 11-12).

### C. Concentration, Persistence, Pace

As her third claim for relief, Plaintiff alleges that "although the [ALJ] specifically determined that [she] had moderate difficulties in concentration, persistence, or pace, the [ALJ] failed to include any limitation upon [her] concentration, persistence, or pace in his [sic] residual functional capacity assessment, without explanation." (Plaintiff's Brief at 12.) She cites Stewart v. Astrue, 561 F.3d 679 (7th Cir. 2009) for her assertion that a limitation to simple, unskilled work does not adequately reflect her limitations. (Id. at 12-13.) Defendant asserts that "the ALJ fully considered the effect of Plaintiff's symptoms on her concentration, persistence, and pace when she limited Plaintiff to simple, repetitive tasks and work with an SVP of no more than 2." (Defendant's Brief at 12.)

20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(C)(3) states in relevant part:

*Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.

. . .

> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks . . . . Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

The ALJ began her assessment of Plaintiff's RFC prior to Step Four by explicitly stating that "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis" performed at Step Three of the sequential evaluation. (R. at 25.) That "degree of limitation" included "moderate difficulties" in Plaintiff's social functioning and concentration, persistence or pace. (Id. at 24.) In support of this finding, the ALJ gave "great weight" to the prior finding of ALJ Swank. (Id. at 25.) In his decision denying Plaintiff's previous application, ALJ Swank found that Plaintiff had "moderate difficulties" in concentration, persistence, or pace because of her "impaired memory and borderline intellectual functioning." (Id. at 83-84.) He specifically noted that Plaintiff's "borderline intellectual functioning limits her ability to perform detailed or complex tasks" and that she needed reminders to pay her bills. (Id. at 83.)

At Step Four, the assessment of Plaintiff's RFC, the ALJ found that Plaintiff was "limited to performing simple repetitive tasks and work with an SVP of no more than 2." (Id. at 25.) She based her decision on the consultative psychological examinations of Plaintiff performed by Harold Slaughter, M.S., on May 26, 2010, and by Harry Hood, M.S., in November 2011 . (Id. at 27.) Mr. Slaughter diagnosed Plaintiff with borderline intellectual functioning, a history of alcohol abuse, and an anxiety disorder NOS. (Id. at 396.) Mr. Hood also diagnosed Plaintiff with borderline intellectual functioning. (Id. at 482.) He also noted that her concentration was moderately deficient. (Id. at 481.)

The ALJ also based her decision on the prior RFC assigned by ALJ Swank. The Fourth Circuit has noted that *res judicata* applies to Social Security disability cases and that this concept applies "to prevent the Secretary from reaching an inconsistent result in a second proceeding based on evidence that has already been weighed in a claimant's favor in an earlier proceeding." Lively v. Sec. of Health & Human Servs., 820 F.2d 1391, 1392 (4th Cir. 1987). However, while an ALJ must consider prior RFC findings, he or she is not bound to adopt those RFC findings verbatim. Albright v. Comm'r, 174 F.3d 473, 476-77 (4th Cir. 1999). Thus, "where a final decision . . . after a hearing on a prior disability claim contains a finding required . . . in the sequential evaluation process . . ., SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a . . . claim involving an unadjudicated period." AR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000). Accordingly, it was proper for the ALJ to consider the prior RFC assigned by ALJ Swank when considering Plaintiff's limitations on concentration, persistence, or pace.

Given this evidence, it is clear that the ALJ considered Plaintiff's limitations on concentration, persistence, or pace when assessing Plaintiff's RFC. After considering the record, particularly the consultative examinations performed by Mr. Hood and Mr. Slaughter and the prior RFC assessed by ALJ Swank, the ALJ determined that while such limitations existed, they did not preclude Plaintiff from performing simple, repetitive work with an SVP of no more than 2. The undersigned finds that Plaintiff's reliance on Stewart is misplaced, as:

> First, the question presented in *Stewart* was the availability of attorney's fees under the Equal Access to Justice Act based on an ALJ's contravention of agency regulations and judicial precedent, both in determining RFC and formulating a hypothetical given to a vocational expert. . . . Second, the discussion . . . cite[d] specifically addresses the requirement that hypothetical questions to a vocational expert must include all limitations supported by medical evidence in the record . . .

*Gullace v. Astrue*, No. 1:11cv-755, 2012 WL 691554, at *21 (E.D. Va. Feb. 13, 2012) (rejecting claimant's argument that the ALJ cumulated his mental impairments into a less-detailed conclusion and that the ALJ failed to include any limitations on concentration, persistence, or pace in his RFC assessment). Rather, Plaintiff cites <u>Stewart</u> for the proposition that "all limits on work-related activities resulting from mental impairments must be described in the mental residual functional capacity assessment." (Plaintiff's Brief at 13.) This Court has already rejected Plaintiff's reliance on <u>Stewart</u> for this proposition. <u>See</u> <u>Mills v. Astrue</u>, No. 2:11-cv-65, 2012 WL 2030093, at *17-18 (N.D. W. Va. Apr. 9, 2012) (Joel, Mag. J.), <u>adopted by</u> <u>Mills v. Astrue</u>, No. 2:11-cv-65, 2012 WL 2030066 (N.D. W. Va. June 6, 2012). As discussed above, the ALJ did describe Plaintiff's credible mental impairments in her RFC assessment. Therefore, the undersigned find that the ALJ properly considered Plaintiff's limitations in concentration, persistence, or pace in her RFC assessment.

### D. Treating Physicians

Plaintiff alleges that the ALJ failed to properly evaluate the opinions of her treating physicians, Drs. Withuhn and Burgess. (Plaintiff's Brief at 7-12.) Defendant asserts that substantial evidence supports the ALJ's decision to assign little weight to these opinions. (Defendant's Brief at 9-11.) Upon review of the ALJ's decision, the undersigned has also included the State agency consultants, Drs. Lateef and Lim, in his discussion.

20 C.F.R. § 416.927 states:

(c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

43

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources

have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

45

> inconsistent with the other substantial evidence in [the] case record, we
> will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence
> or if it is inconsistent with other substantial evidence, it should be accorded
> significantly less weight.

76 F.3d at 590.  Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary."  DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."  Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).  Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977).  The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will
> always give good reasons in the notice of the determination or decision for the weight
> given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and
> severity of an individual's impairment(s).  Therefore:

> When the determination or decision:

> *is not fully favorable, e.g., is a denial; or

> *is fully favorable based in part on a treating source's medical opinion, e.g., when the
> adjudicator adopts a treating source's opinion about the individual's remaining ability
> to function;

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

"[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150. As to Dr. Withuhn and Dr. Burgess' opinions, the ALJ wrote: "The assessments of Thomas Withuhn, M.D., and of John Burgess [sic], M.D., are given little weight, as it is extreme and inconsistent with the claimant's objective findings and course of treatment (Exhibit B22F)." (R. at 27.)

Given this, the undersigned finds that the ALJ failed to "sufficiently articulate[]" reasons for assigning little weight to the opinions of Drs. Burgess and Withuhn as "to permit meaningful judicial review" by this Court. See DeLoatch, 715 F.2d at 150. While the ALJ did discuss whether their opinions were consistent with the record, see 20 C.F.R. § 416.927(c)(4), she referred to their opinions in a summary fashion without referencing a single opinion or piece of evidence with which they were inconsistent. At no point did she address any of the other factors set forth above when considering Dr. Withuhn and Burgess' opinions.

The undersigned notes that Dr. Burgess and Dr. Withuhn's opinions may properly be entitled to little weight. For example, both Dr. Burgess and Dr. Withuhn stated that Plaintiff needed to lie down or sit in a recliner for a substantial portion of each day. (R. at 653, 702.) This assessment

47

appears to lack clinical support from any evidence contained in the record. On the other hand, Drs. Withuhn and Burgess both opined that Plaintiff would need to alternate positions frequently because of her pain. (R. at 651, 700.) As set forth above, there is ample medical evidence in the record, including treatment notes from both Dr. Withuhn and Dr. Burgess, documenting Plaintiff's back impairments and resulting pain. (See, e.g., R. at 563-64, 572-73, 616, 620, 624, 636-37, 661, 680-81.) Nevertheless, the ALJ failed to assess this or any other evidence in discrediting Dr. Withuhn and Dr. Burgess' opinions. See DeLoatch, 715 F.2d at 150

Even where a treating physician's opinions are not entitled to controlling weight, they are generally entitled to more weight than the opinion of a consultative physician. See 20 C.F.R. § 416.927(d)(1). Here, the ALJ gave "some weight" to the opinions of the State agency physicians, Drs. Lateef and Lim. With respect to their opinions, the ALJ stated:

> The State agency consultants, who are skilled and experienced in reviewing records and assessing the impairments and limitation that are documented in those records, evaluated the all [sic] of the medical evidence and concluded that the claimant was limited to less than a full range of light work. These assessments has [sic] been considered, and are given some weight in the formulation of this opinion, however, I have incorporated additional limitations into the above stated residual functional capacity assessments in deference to the claimant's subjective complaints and the additional evidence received.

(R. at 27-28.) However, contrary to the ALJ's decision, the State agency physicians did not evaluate all of the medical evidence. Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff on December 13, 2011 (R. at 584-91), and Dr. Lim completed the same on February 12, 2012 (R. at 593-600.) The record, however, contains evidence that Plaintiff continued to receive treatment for back pain subsequent to February 2012. Accordingly, the undersigned finds that the ALJ also failed to provide reasons for assigning "some weight" to these opinions that are "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

While it is the exclusive province of the ALJ to weigh the evidence contained in the record, the ALJ's findings cannot withstand judicial review when the ALJ fails to articulate its reasoning or substantiate its findings. See id.; Miller v. Astrue, No. 1:12-cv-37, 2013 WL 588722, at *48-49 (N.D. W. Va. Jan. 156, 2013), aff'd by Miller v. Astrue, 2013 WL 557277 (N.D. W. Va. Feb. 13, 2013) (remanding case because "the ALJ's discussion of the treating physician's opinions [did] not comply with the regulations or rulings regarding treating physician opinions"); Trimmer, 2011 WL 4589998, at *6 (remanding case because ALJ failed to sufficiently articulate findings and provide substantial evidence for rejecting the opinion of a treating physician). In sum, the undersigned finds that the ALJ failed to sufficiently articulate her reasons for assigning "little weight" to the opinions of Drs. Withuhn and Burgess and "some weight" to State agency consultants Drs. Lateef and Lim. Accordingly, the undersigned finds that the ALJ's assessment of Plaintiff's residual functional capacity is not supported by substantial evidence.

### E. Narrative Discussion for RFC

As her first assignment of error, Plaintiff alleges that the ALJ "failed to set forth a narrative discussion describing how the evidence supported each conclusion [in her RFC assessment], citing specific medical facts and nonmedical evidence." (Plaintiff's Brief at 5-6 (alteration in original).) Specifically, Plaintiff states that the ALJ "failed to properly assess [her] limitations as required pursuant to Social Security Ruling 96-8p." (Id. at 4 (alteration in original).) The undersigned has already found that the ALJ erred by failing to provide sufficient reasoning for assigning "little weight" to the opinions of Plaintiff's treating physicians and "some weight" to the opinions of the State agency consulting physicians. Having found that, it follows that substantial evidence does not support the ALJ's narrative discussion of Plaintiff's RFC assessment.

### F. Neck and Back Limitations

As her final claim for relief, Plaintiff alleges that the ALJ erred by not including any limitations regarding Plaintiff's neck and back impairments in her assessment of her RFC. (Plaintiff's Brief at 13-14.) Specifically, Plaintiff alleges that the ALJ should have included limitations related to these impairments, such as Plaintiff's "ability to rotate her head from side to side, or up and down." (Id. at 14.) The undersigned has already found that the ALJ erred by failing to provide sufficient reasoning for assigning "little weight" to the opinions of Plaintiff's treating physicians and "some weight" to the opinions of the State agency consulting physicians. Having found that, it follows that upon remand, the ALJ should consider whether Plaintiff's neck and back impairments warranted further limitations in her RFC.

### V. CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period. Accordingly, the undersigned recommends that the case be reversed and remanded for the Commissioner to provide further discussion and analysis of the medical opinion evidence, to provide a more thorough narrative statement supporting her determination of Plaintiff's RFC, and to determine whether Plaintiff's neck and back impairments warranted further limitations in her RFC.

### VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's

Motion for Summary Judgment be **GRANTED IN PART** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 7 day of March , 2014.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE